**FRASER v. UNITED STATES.**

**THE EDWARD BATES.**

**No. 1182.**

District Court, D. Massachusetts.

June 16, 1947.

Nathan Greenberg, Ely, Bradford, Bartlett, Thompson & Brown, Charles W. Bartlett and John O. Parker, all of Boston, Mass., for libellant.

William T. McCarthy, U. S. Atty., Gerald J. McCarthy, Asst. U. S. Atty., Seymour P. Edgerton, and Bingham, Dana & Gould, all of Boston, Mass., for respondent.

WYZANSKI, District Judge.

Fdg. 1. This is a suit under the Suits In Admiralty Act, 46 U.S.C.A. § 741, and the Clarification Act, 50 U.S.C.A.Appendix, § 1291, which together subject the United States to certain provisions of the Jones Act, 46 U.S.C.A. § 688.

Fdg. 2. Libellant was employed as a messman aboard the Edward Bates, a vessel operated during the war by the War Shipping Administration, an agency of the United States. In that capacity libellant was an employee of the United States and was serving in its merchant marine. While libellant was aboard the Edward Bates on February 1, 1944, in the Mediterranean, the ship was attacked by enemy airplanes which fired a torpedo that grievously wounded him. His claim is that the injury would not have been inflicted except for the negligence of the master of the Edward Bates, who, in libellant's view, failed in his duty to ask the commodore of the convoy in which the Edward Bates was sailing for authorization to stream the port torpedo net with which the Edward Bates had been equipped by the United States Navy. The first issue is, therefore, whether the master was negligent; and other issues are whether the negligence, if any,

was the legal cause of the injury; and, if so, what are the damages.

Fdg. 3. About one year prior to sailing on the 1944 voyage which ended in disaster, the Edward Bates had been fitted by the United States Navy with torpedo nets. Nets of this type were first used by the British some time before we entered the war. These nets had a mesh which left openings of six by ten feet. A net was supplied on the starboard and another on the port side of a vessel. When not in use they were furled or braided up. When lowered or streamed they lay about one foot above water and about twenty-five feet below. It took about 15–20 minutes to effectuate the streaming. [Resp.Ex.D.]

Fdg. 4. The original purpose of these nets was to meet the danger of submarine torpedo attack. The nets were effective in three out of four cases in deflecting, retarding or prematurely exploding submarine torpedoes so that the ship and its crew would be saved from injury.

Fdg. 5. However, these nets were later used in practice by some ships for protection from aerial torpedoes—in which respect their effectiveness was equally great. This wider usage was referred to in reports given to the United States Navy by American naval officers specially instructed to comment upon the uses and effectiveness of the nets. There is no evidence that the War Shipping Administration or Captain Luksich, the master of the Edward Bates, ever heard of these reports.

Fdg. 6. When the nets were originally installed on the Edward Bates and at later dates, officers of the United States Navy gave to the deck officers and crew of the Edward Bates oral instructions on the mechanical operation of the nets and put them through a drill. [R. 50; Thomas, Dep. 6; Luksich, Dep. 40, 51] Then and later officers of the United States Navy gave the master written instructions as to when the nets should be used. [Symington, Dep. 10] In these instructions masters were authorized to stream nets when their ships were not in convoy, and were advised to do so in certain areas. [Resp.Ex.C, Encl.A] But masters were not authorized to stream nets when their ships were in convoy except upon "orders by the Commodore of the Convoy". [Resp.Ex.A and D; Symington, Dept. 5] Throughout these written instructions the references were only to the use of nets against submarine torpedoes [See, for example, Resp. Ex.C, Encl.B; Resp.Ex.D. par 7].

Fdg. 7. No evidence has been offered to show that by word of mouth or in writing the master of the Edward Bates was told that the nets were useful against aerial torpedoes.

Fdg. 8. In fact the January 1944 sailing on the Edward Bates was the first occasion when the master had sailed on a boat with torpedo nets [Luksich, Dep. 34] and he was so ignorant of their use that, erroneously, he thought them applicable as a defense only in port and not at sea. [Luksich, Dep. 39–40, 53]

Fdg. 9. Under the mastership of Captain Luksich and equipped with torpedo nets the Edward Bates sailed from Hampton Roads on January 14, 1944, as part of an American convoy. Originally 72 ships were being escorted, but after passing Gibraltar the convoy included only 55 ships and 4 escorts. [Resp.Ex.E.] Of those in the escort not more than 7 or 8 [Symington, Dep. 4] and possibly only 2 [Luksich, Dep. 32] had torpedo nets. One reason, perhaps, was that by December 29, 1943, the Navy had discontinued installation of new nets, though continuing old ones. [Resp.Ex.C, Encl.D] on the 407 ships which had already been outfitted. [R. 75]

Fdg. 10. On January 16, 1944, the Edward Bates, while in the convoy, encountered a storm while crossing the Atlantic Ocean. This storm so damaged the vessel's net on the starboard side that it could not thereafter be used. The damage did not impede the use of the torpedo net on the port side nor did it create a situation wherein the use of the port net alone would make the ship unmanoeuverable.

Fdg. 11. After the damage to the starboard net, the Edward Bates which temporarily had lost its place in the convoy resumed its earlier position as the lead ship in the eighth column of the convoy. In that position it had seven columns of ships to its port, several columns of ships

to its starboard and several ships directly astern.

Fdg. 12. On February 1, the Edward Bates, having crossed the Atlantic and passed the Rock of Gibraltar, was sailing as part of the convoy in the Mediterranean on a sunny, bright day in a calm sea. The members of the crew were performing their usual duties and during the day libellant had prepared and served meals and during his time off had been sunning himself on the deck.

Fdg. 13. Between 4 p. m. and 6 p. m. the commodore of the convoy, the master and the chief officer of the Edward Bates had warnings of a potential enemy aerial attack. [Thomas, Dep. 23–25; Luksich, Dep.16; Resp.Ex.E]

Fdg. 14. By 6 p. m. three friendly Spitfires were spotted. At the same time the Edward Bates and the other ships in the convoy called the navy gunners on deck.

Fdg. 15. At 6:55 p. m. a general alarm sounded. Whistles were blown; bells were rung.

Fdg. 16. At no time did the commodore direct, nor did either the master of the Edward Bates or the master of any other vessel request, the lowering of torpedo nets of any ship in the convoy. [Symington, Dep. 13] And the nets on the Edward Bates were in fact not lowered.

Fdg. 17. I do not make any finding as to whether the nets on other ships were or were not lowered. I have in evidence before me no records or logs of other ships, and no testimony from persons on other ships. The only relevant testimony as to the nets on other ships comes from two witnesses (the libellant and Thomas F. Gill) who were on the Edward Bates. Their observations were so affected by their movements or positions or by the surrounding athmosphere that I am not able on their testimony to find either that those nets were down or were not down. Whichever party in this litigation seeks to build an argument based upon the state of the nets on the other boats has failed to establish his initial premise. Thus, I cannot say, as libellant contends, that other vessels lowered their nets and this by itself justifies me in concluding that a reasonable and prudent master of the Edward Bates should have lowered his nets. Nor can I say, as respondent contends, that since other vessels did not lower their nets, this by itself justifies me in concluding that a reasonable and prudent master of the Edward Bates would not have lowered his net. But I can and do say that if the nets of ships other than the Edward Bates were in fact streaming, the master of the Edward Bates did not, and, from where he stood, could not observe those lowered nets.

Fdg. 18. At 6:55 p. m. the libellant had served supper to the crew and had finished cleaning up the galley. He started for his quarters. Just as he passed the companionway libellant was hit by an aerial torpedo and knocked unconscious. The aerial torpedo had been fired from an enemy airplane and its path was directly through the place where the port torpedo net would have been hanging had it been lowered.

Fdg. 19. If the port torpedo net had been lowered in place, the chances are 3 out of 4 that it would have deflected, retarded or prematurely exploded the enemy torpedo so that no injury would have been inflicted on libellant.

Fdg. 20. After being hit, the libellant was removed by other crew members on a lifeboat to which he was lashed. Later that day he was picked up by a British escort ship and was transferred to a British destroyer. While on the destroyer he was given an injection to make him unconscious. From the ship he was taken by ambulance to the hospital in Algiers. There he was operated on and was placed in casts which covered both legs from his toes to his hips and other casts covered his body from his hips to his navel and his left fingers up to the left collarbone. Patches were applied to burns and cuts on his body. He remained in the Algiers hospital for about two months. During this time he was constantly given narcotics and except when subject to them was unable to sleep and was in dire pain. Emergency operations were performed on him, hot oil was administered, arteries were opened, blood plasma was given to him and other hospital attention was pro-

vided. He declined in weight from 168 pounds to 100 pounds.

Fdg. 21. About April 1 the libellant was carried by a British transport plane to the 46th General United States Army Hospital at Oran. He was there for two months suffering severe pain while his casts were changed from time to time. He was not operated upon.

Fdg. 22. On May 25, the libellant was taken aboard the hospital ship, St. Mihiel, from which he disembarked at Charleston, South Carolina, on June 6, 1944. At the Ropes Hospital at South Carolina the libellant's casts were removed, patches on his burns were ripped off and he was hospitalized for nine days.

Fdg. 23. Later in June, he was taken to the Marine Hospital at Staten Island, New York. His transportation was effectuated by carrying him to and from the train by ambulance and stretcher and placing him in and taking him out of a Pullman berth through a Pullman window car.

Fdg. 24. On June 25, 1944, the libellant was taken to the Marine Hospital in Portland, Maine. Three or four weeks later the doctors at that hospital operated upon and amputated his right leg. The operation cut the leg about nine inches below the right knee.

Fdg. 25. Later a second operation was performed in the Portland hospital. From this and the preceding operation he suffered great pain in the stump of his leg and in his nerves. After the operations were completed, he regained his appetite and his capacity to sleep, both of which had been previously greatly impaired. In the Portland hospital in July, 1945, the libellant was subjected to a third operation which made it possible to pull down the skin of the stump of his leg, to sew it up and to enable him to have an artificial limb fitted.

Fdg. 26. August, 1945, the libellant was transferred to the Brighton Marine Hospital where the artificial limb was attached to his right leg on August 8, 1945. In addition to this operation in connection with the stump, three additional minor operations on the libellant's right side were performed at Brighton.

Fdg. 27. The libellant was discharged from the Brighton Hospital on December 16, 1946. Up to that date he had spent most of the time since his accident on February 1, 1944, in hospitals or in vehicles transporting him from one hospital to another. On the nearly 400 days when he was not in hospitals, he sometimes provided for himself, sometimes went to his parents' home. [Stipulation No. 1; R. 25–26]

Fdg. 28. After his treatments were completed on December, 1946, he lacked a right leg; he was unable to lift his left arm to quite the same height as his right arm; he was unable to grasp firmly with his left hand, although he was able to flex the fingers so that virtually all of them were able to make contact with other fingers of that hand. His left leg gave some aching pain when he stood too long upon it. Under ordinary circumstances the stump of his right leg does not bother his nerves, although it sometimes itches and it gives him an aching pain in stormy weather.

Fdg. 29. Libellant has made diligent efforts to secure work since he has left the Brighton Hospital. Prior to entering the merchant marine, he had been educated through the ninth grade which is the equivalent in Maine of junior high school. Aside from some early jobs in tending gardens and mowing lawns, the only occupation he had before entering the merchant marine was as a ship fitter between 1928 when he graduated from the Portland Junior High School and October, 1943, when he joined the merchant marine. He had served for seven years as a ship fitter, mostly, if not entirely, in the Bath Iron Works at Bath, Maine, at unspecified wages. During his service with the merchant marine he received per month $87.50 wages plus $87.50 bonus for war risks plus "found" worth somewhere between $3 and $4 per day. His injury makes it impossible for him to return to either the merchant marine or to shipfitting or indeed to pursue any calling which does not allow him to remain seated at a bench chair. That restricted type of employment he has not been able to find in the last two

months, although he is hopeful that he may secure it later.

Fdg. 30. Libellant at the time of the injury had a life expectancy of 33.92 years.

Fdg. 31. When he entered the merchant marine in return for his services, and not in return for any additional cash payment then or at a later date, the libellant received from the Government of the United States an insurance policy known as the Second Seaman's War Risk Policy. Article 25, paragraphs C and D, of that policy provided that payment and acceptance of benefits under the policy shall constitute a pro tanto release and satisfaction of all causes of action against the United States in the operation of the vessel arising out of the disability for which the benefit was paid. These clauses specifically apply to claims for maintenance and cure. Pursuant to this policy, the Government of the United States has paid the libellant on account of the damages sustained from the accident of February 1, 1944, $5,000.

■ Conc. 1. The master of the Edward Bates, and hence the respondent, in this case, were not insurers of the libellant's safety but each had a duty to the libellant to have those precautions taken which reasonable care, intelligence and regard for the libellant's safety required. Restatement, Agency § 493. Roberts v. United Fisheries Vessel Co., 1 Cir., 141 F.2d 288, 291; Chespeake & Ohio R. Co. v. Richardson, 6 Cir., 116 F.2d 860, 863; Pieczonka v. Pullman Co., 2 Cir., 89 F.2d 353; 357.

■ Conc. 2. The master did not in fact know and there was no reason that he should have known that the torpedo nets with which the Edward Bates was equipped were of substantial value in safeguarding crews by rendering harmless aerial as well as submarine torpedoes. The written instructions to him referred only to submarine torpedoes. His own experience and knowledge did not suggest to him the propriety of the use of nets against aerial attacks at sea. And the desirability of such use would not be self-evident, since an experienced mariner might reasonably suppose first, that the nets were no protection against aerial torpedoes and second, that such protection as they furnished counted less than the freedom of movement and manoeuverability which a ship would have if its nets were furled, particularly if one net had been damaged. [Luksich, Dep.50]

■ Conc. 3. Since the master had no reason himself to know of the value of the nets against aerial attack he was under no duty to request the convoy commodore's permission to lower nets. On his state of knowledge, the master was justified in awaiting instructions from the commodore. [Cf.Luksich Dep. 56–57]

Conc. 4. From the foregoing conclusions it follows that in failing to request the commodore's authorization to lower the torpedo nets the master of the Edward Bates was not lacking in due care toward the libellant and that the respondent was not negligent.

Conc. 5. Despite lack of negligence, respondent is liable for libellant's maintenance and medical care.

Conc. 6. The maximum amount which the evidence would allow as libellant's recovery for his maintenance is less than $5,000. And he claims nothing for medical care.

Conc. 7. Libellant having already been paid $5,000 he is entitled to no further amount.

Decree for respondent with costs."