## FRASER v. UNITED STATES.

### No. 4283.

Circuit Court of Appeals, First Circuit.

April 9, 1948.

Rehearing Denied May 13, 1948.

Charles W. Bartlett and John O. Parker, both of Boston, Mass. (Nathan Greenberg and Ely, Bradford, Bartlett, Thompson & Brown, all of Boston, Mass., on the brief), for appellant.

Seymour P. Edgerton, of Boston, Mass. (Bingham, Dana & Gould, William T. McCarthy, U. S. Atty., and Edward O. Gourdin, Asst. U. S. Atty., all of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This is an appeal from a final decree of the district court dismissing a libel brought in a proceeding under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and the Clarification Act, 50 U.S.C.A.Appendix, § 1291, which in effect make the Jones Act, 46 U.S.C.A. § 688, applicable in suits against the United States. The libellant seeks to recover medical expenses, maintenance and damages for personal injuries.

The libellant joined the Merchant Marine in October, 1943, and after an eight weeks course in steward training at Sheepshead Bay, New York, was transferred to another school at Norfolk, Virginia. On December 8th at Norfolk he joined the crew of the vessel Edward Bates as a messman. The vessel was then operated by the War Shipping Administration. The ship under the command of Captain Luksich left Hampden Roads on January 14, 1944, for the Mediterranean, in a convoy of about seventy-two ships. Before its departure it had been fitted on both sides with torpedo nets. The nets which were about 200 feet in length were furled above the deck when not being used, and when in use were lowered in the water. When lowered or streamed they were one foot above the water and twenty-five feet below. The purpose of the nets, which were made of steel wire crossed to form a mesh with openings of six feet by four feet was to offset the danger of submarine attack by deflecting, retarding or prematurely exploding submarine torpedoes. The deck officers and crew of the vessel Edward Bates had been given oral instructions by officers of the Navy on the mechanical operation of the nets when they were installed and later the captain was given written instructions as to

when the nets should be used. These instructions authorized and advised masters to stream the nets in certain submarine infested areas when ships were not in convoy. When in convoy masters were to stream the nets on orders of the convoy commodore. All written instructions referred only to the use of the nets against torpedoes from submarines. When Captain Luksich sailed on the Edward Bates it was the first time he had sailed on a vessel equipped with torpedo nets and he erroneously thought that they were to be used as a defense only in port and not at sea.

The district court found on the basis of expert testimony that as protection against submarine torpedoes the nets were effective in three out of four cases. There was also testimony, which the district judge accepted as correct, that the nets had been found to be of equal effectiveness against aerial torpedoes, but there was no evidence that the War Shipping Administration or Captain Luksich knew that the nets could be used as protection against aerial torpedoes.

The convoy, which had been under the command of a naval officer of the United States while in the Atlantic, proceeded under the command of a British commodore after it entered the Mediterranean. It was reduced to fifty-five vessels and of these not more than about seven or eight and maybe only two were equipped with torpedo nets. The net on the starboard side of the Edward Bates had been so damaged during a storm in the Atlantic that it could not be used, but this did not render the net on the port side unusuable. On February 1st the vessel was sailing as part of this Mediterranean convoy in a calm sea on a bright sunny day. Between four and six o'clock in the afternoon warning of a potential aerial attack was received by the commodore of the convoy and the master and chief officer of the Edward Bates. About six o'clock the navy gunners were called on deck, and at six forty-five a general alarm was sounded. The commodore did not order nor did the master of the Edwards Bates, nor the master of any other vessel, request the lowering of torpedo nets. The nets on the Edwards Bates were not lowered. The district judge stated that from the evidence before him he was unable to find whether other vessels lowered their nets, or not. He did find, however, that if nets on other ships in the convoy were lowered, the master of the Edward Bates did not and from where he stood could not observe these lowered nets.

At six fifty-five the libellant had just passed the companionway when the vessel was struck by an aerial torpedo. The torpedo had been fired from an enemy airplane and had come through the place where the port torpedo net would have been hanging had it been lowered. The libellant was knocked unconscious. He was given assistance by other members of the crew, and was removed to a life boat before the ship sank. Later he was picked up and transferred to a British destroyer and taken to Algiers. In Algiers he was operated on and placed in casts. He was transferred through various hospitals to the United States, where he underwent several more operations including the amputation of his right leg. Finally, on December 16, 1946 he was discharged from the hospital. He is seriously disabled now, and still suffers pain on occasions. He has received $5,000 under an insurance policy which was issued to him by the United States Government when he entered the merchant marine. The policy provides that acceptance of benefits under it constitutes a pro tanto release of any claim against the United States arising out of the disability for which the benefit is claimed.

The district court found that there was no reason for the master to know that the nets were effective against aerial torpedoes; that the master was justified in awaiting instructions from the convoy commodore before lowering his nets; and that he was under no obligation or duty to request permission. It concluded there was no negligence and dismissed the libel. It also concluded that even though there was no negligence the United States was liable for the libellant's maintenance and cure, but he was not entitled to any additional payment since he had been furnished medical care and he had already received $5,000 which was more than the maximum amount which the evidence would allow as recovery for his maintenance.

The main issue which is presented on appeal is whether the district court's finding that there was no reason why the master of the Edward Bates should have known that the torpedo nets were effective against aerial torpedoes is correct. If a reasonably prudent master of the Edward Bates would not know this, clearly Captain Luksich was not negligent in not requesting permission to stream his nets from the convoy commodore. On the basis of the record we cannot find that a reasonably prudent master would have known of the effectiveness of the nets against aerial torpedoes. It is true that the district court found as a matter of fact that the nets were equally effective against aerial torpedoes. But the War Shipping Administration was not informed of this so far as appears on the record, and the captain of the Edward Bates was not informed. All the written instructions stressed only the nets' effectiveness against submarines. All the documents in the record refer only to submarine or U-Boat danger. If the other ships in the convoy which were equipped with nets had their nets lowered, the master of the Edward Bates was unable to observe them. The effectiveness of the nets against aerial attack is hardly self-evident. In fact, in the district court, the United States insisted that the nets were not equally effective against aerial torpedoes. It contended that there was a difference in the type of torpedoes, and the way they were used, that affected the defensive attributes of the net. In this court, the United States continues to press this point, arguing that the testimony that the nets were effective against aerial torpedoes was incompetent so that there was no evidence to support the district court's finding. But even if we reject this contention of the United States and accept the district court's finding, that in fact the nets are equally effective against air or submarine torpedoes, we cannot agree with the libellant that the master should have known this. Since the master did not know and no reason is shown why a reasonably prudent master in his position would have known of the value of the nets against air attack, he was not negligent in not requesting permission from the convoy commodore to stream the nets. It might be seriously doubted whether he could be considered negligent even if he did know. The district court found, and there is evidence in the record to support the finding, that masters of ships in convoy are not authorized to stream nets except upon orders of the commodore. The commodore was taking precautions against the attack: He had ordered a balloon barrage, the ships had been closed in, and smoke floats were being burned. A master could hardly be considered negligent for relying on the commodore's ability and experience when the commodore is obviously alert to danger. We do not think that a master under such circumstances has a duty to question the convoy commodore.

The libellant's other arguments may be disposed of briefly. It is clear upon a reading of the findings and conclusions of the District Court that it applied a proper standard of negligence. It did not use a subjective test, as the libellant maintains, but applied the customary and well established reasonably prudent man standard. References to the particular captain's knowledge were no doubt only intended to indicate that he had no particular knowledge making him responsible for a high standard of care.

The libellant also argues that the captain was negligent in not streaming or at least requesting permission to stream the nets because of the danger of submarines in the area and that this failure was the legal cause of the accident. To succeed on this contention, the libellant must establish (1) that the captain had a duty to take the initiative in asking permission to stream the nets even though in convoy, and (2) that breach of this duty by the captain was the legal cause of the libellant's injuries. But as we have indicated above, we do not think that a captain would be negligent in not requesting permission to stream his nets, where the convoy commodore, a naval officer, is in complete control. Furthermore, there is nothing to show that if the libellant had requested permission the commodore would have granted it.

The judgment of the district court is affirmed.