**Mrs. Maxine Hilliard BISHOP et al.**

v.

**UNITED STATES of America.**

**Civ. A. No. 67–1205.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 31, 1969.

---

3. This now is 28 U.S.C. § 1331(a).

Badeaux & Discon, Reginald T. Badeaux and Kierr & Gainsburgh, by Jack C. Benjamin, Trial Atty., New Orleans, La., for plaintiffs.

U. S. Atty., Kathleen Ruddell, Asst. U. S. Atty., New Orleans, La., William E. Gwatkin, III, Trial Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

MITCHELL, District Judge.

Mrs. Maxine Hilliard Bishop, widow of John Alvah Bishop, a seaman who lost his life when the S/S *Baton Rouge Victory* was sunk by an enemy mine in the Long Tao Channel of the Saigon River, South Viet Nam, on August 23, 1966, individually and on behalf of her two minor children, John A. Bishop and Thomas Neal Bishop, brought this action against the United States of America to recover damages for the death of her husband.

After considering the evidence and briefs submitted by counsel, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### I

Plaintiff, Maxine Hilliard Bishop, the personal representative of the estate of John Alvah Bishop, was appointed Administratrix of her deceased's husband's succession by the Civil District Court for the Parish of Orleans, State of Louisiana.[1]

#### II

At all times material hereto, the United States of America was the owner and operator of the S/S *Baton Rouge Victory*, an AP–2 class cargo ship.[2] In December of 1965 she was withdrawn from the National Reserve Fleet for reactivation, assigned for husbanding to States Steamship Company as general agent and, in February of 1966, after being declared seaworthy, was allocated by the United States Navy Military Sea Transportation Service to carry military supplies to the armed forces in Southeast Asia.[3]

#### III

On or about July 26, 1966, John Alvah Bishop joined the vessel at San Francisco, California as her first assistant engineer.

#### IV

The master of the *Baton Rouge Victory* was Captain Konrad F. Carlson, a licensed master since 1934. Her chief engineer was Herbert F. Kenyon, licensed as such since 1943. Although this was Bishop's first trip to Viet Nam and his first tour of duty aboard the *Baton Rouge Victory,* both Captain Carlson and Chief Kenyon had served on her since her reactivation and had sailed on other vessels into the port of Saigon on numerous occasions since 1952.[4]

#### V

Pursuant to military sailing orders, the *Baton Rouge Victory* departed from San Francisco, California, on July 28, 1966. She was designated as a SEA Express vessel, indicating that her military cargo, destined for Saigon, South Viet Nam and Bangkok, Thailand, had a high military priority.[5]

#### VI

She arrived at the mouth of the Saigon River on Friday, August 19, 1966; anchored at Cap St. Jacques at approximately 11:52 AM; and awaited further movement orders from the Commander of the Navy Military Sea Transportation Office at Saigon.[6]

#### VII

She was equipped with two boilers which supplied steam for her main propulsion unit and, during the voyage from San Francisco, she experienced minor difficulties with her port boiler. On Monday, August 22, 1966, while still at anchorage at Cap St. Jacques, Chief Engineer Kenyon, with the master's permis-

1. Exhibits P–16, P–17 and P–18.

2. Exhibit D–8.

3. Exhibits D–4 and D–5.

4. Testimony of Captain Carlson; deposition of Chief Kenyon, pp. 5, 6, 7, 41.

5. Exhibit P–2, 2A, 2B; testimony of Captain Melvin P. Warfield, U. S. Army.

6. Exhibit P–5.

sion, took the port boiler off the line for repairs.[7]

During the early evening hours of that day orders were received from MSTS requiring the vessel to proceed to Saigon at 7:30 AM on August 23. To protect the vessel from snipers while transiting the river, three military policemen boarded her as armed guards.[8]

## VIII

Passage from the sea to the Port of Saigon requires transit of various channels of the Saigon River for a distance of 46 miles. The major portion of the passage, from the sea through the Long Tao Channel to the town of Nha Be, is through what the military calls the Rung Sat Special Zone, a swampy area of the Saigon River delta heavily infiltrated by the Viet Cong. This zone is under the exclusive control of the South Vietnamese and the United States Naval authorities.[9] The Saigon River was regularly patrolled by military aircraft and patrol boats. Although the principal danger to vessels traversing the river was from small arms or artillery fire from the river banks, mines were regarded as a potential threat and the river was swept regularly by minesweepers of the United States and South Vietnamese Navies.[10]

Although equipped with a fathometer, the *Baton Rouge Victory* had no underwater sonor or mine detecting equipment aboard.[11]

## IX

At 7:37 AM on August 23, the *Baton Rouge Victory* weighed anchor. She proceeded up the Saigon River at a speed of 12 knots, powered by the starboard boiler only. Both Captain Carlson and MSTS knew that her port boiler was out of commission.[12]

## X

Since pilotage is compulsory for the Saigon River, the *Baton Rouge Victory* was under the control of a civilian Vietnamese pilot.[13] Captain Carlson stationed himself on the bridge to be readily available to navigate his ship should she suffer an armed attack.

## XI

After getting underway, the Chief electrician and his assistant came into the engine room to begin their daily work. A work party, consisting of the second assistant engineer, a wiper and an oiler began making preparations to repair the port boiler. Bishop returned to the engine room shortly before 9:00 AM and Chief Kenyon, who was at the throttle controls with another oiler, sent Bishop down to the fireroom platform in the lower engine room to supervise and assist the fireman-watertender on the combustion board and water regulator.[14]

## XII

At about 9:10 AM, shortly after the ship had passed an area of the river known as Les Quatre Bras and entered the Long Tao Channel, a violent underwater explosion blasted an opening in the port side of the vessel approximately 43 feet wide by 16 feet up the side of the vessel and 13 feet under the turn of the bilge.[15] The ship went dead in the water and began to sink but her forward

7. Exhibit D–3; testimony of Captain Carlson; deposition of Chief Kenyon, pp. 45, 46.

8. Testimony of Captain Carlson; Exhibit P–5; deposition of Chief Kenyon, p. 55.

9. Testimony of Lieutenant Commander R. F. McCullough, Chief of Staff, Rung Sat Special Zone, U. S. Navy.

10. Testimony of Lieutenant Gerald Scott Young, U.S. Navy.

11. Testimony of Captain Carlson; deposition of Chief Kenyon, p. 57.

12. Testimony of Lt. Young.

13. Testimony of Lt. Young.

14. Deposition of Chief Kenyon, p. 19–20, 32.

15. Exhibits D–11 and D–12; testimony of John F. Allen, U. S. Administrative Office.

momentum permitted Captain Carlson to beach her near the left ascending bank in about 28 feet of water.[16]

## XIII

The testimony revealed that most of the Viet Cong mines were command detonated, i. e., by someone located on shore. From the evidence presented, we find that the cause of the underwater explosion was a command detonated non-contact mine, submerged about 10 feet below the surface of the water, detonated about 5 feet away from the hull of the ship.[17]

## XIV

Plaintiff contends that defendant was negligent in failing to order Bishop to a place of safety aboard the vessel while transiting a war zone area.

It is customary when proceeding through pilotage waters into port, to set a standard maneuvering watch in the engine room.

Chief Engineer Everett Gilman, a merchant seaman since World War II, who had never sailed on the *Baton Rouge Victory* but had sailed on similar vessels, testified that during such a watch the normal complement of engine room personnel consisted of four men:

1—an engineer to man the throttles (usually the first assistant engineer);

2—one fireman—water tender;

3—one standby engineer on watch; and

4—one oiler.

However, Captain Carlson testified that on the *Baton Rouge Victory* it was Chief Kenyon's common practice to man the throttles and have his first assistant on duty in the engine room while the ship was maneuvering.[18]

At the time of the explosion, Bishop and the fireman were on the floor of the engine room, about centerline at the bottom of the ship.

The other five men who died were on the port side, where the explosion occurred.

The only survivors, Kenyon and the oiler, were at the throttle controls on the operating platform, a ledge about 12 to 15 feet above the engine room floor on the starboard side of the vessel.[19]

The plaintiff has inferred that Bishop's rightful place was at the throttle controls. Had Bishop been there and the mine exploded on the starboard side, those at the throttle controls would have suffered the same fate.

Captain Carlson testified that he did not think it would be prudent to limit the number of engine room personnel during a maneuvering watch because at that time he was only concerned with protecting his men from small arms fire.

At the time, no orders had been issued by the military government restricting the number of men to be stationed in an engine room during a maneuvering watch.[20]

■ We find that plaintiff has failed to prove by a preponderance of evidence that Bishop was in the engine room to repair the port boiler and that defendant was negligent in requiring Bishop to be in the engine room during a maneuvering watch. The fact that four other persons (the two electricians and two members of the boiler repair work party) were there had no causal connection with Bishop's death. Bishop was receiving a war risk bonus of one hun-

---

16. Exhibit P–5; deposition of Chief Kenyon, p. 23, et seq.; testimony of Captain Carlson.

17. Testimony of Allen Laverne Hunt, Boatswain Mate 1st Class, U. S. Navy, (Ret). Testimony of George J. Colger, Supervisory Physicist, Underwater Research Explosion Division, Naval Shipyard, Portsmouth, Virginia.

18. Testimony of Captain Carlson; deposition of Chief Kenyon, p. 16.

19. Deposition of Chief Kenyon, pp. 19, 32 et seq.

20. Testimony of Captain Carlson, Chief Everett Russel Gilman and Lt. Young; deposition of Chief Kenyon, pp. 60 and 61; see Exhibit P–3.

dred per cent of his base wages for serving on a vessel in a combat zone subject to enemy attack. Under these circumstances, Bishop's instructions to stand by for maneuvering in the lower engine room did not subject him to any unreasonable risk.

## XV

The testimony revealed that the river was swept for mines by the United States and South Vietnamese Navies at least once a day.[21]

At about 0530 on August 23, 1966, a little before daybreak, two Vietnamese Navy minesweepers commenced their daily sweeping operations at the mouth of the Long Tao River, proceeding upstream toward Saigon at a swap speed of about 5 or 6 knots. They were sweeping for command detonated mines and had swept through the Les Quarte Bras area and the lower reaches of the Long Tao Channel about an hour and a half before the *Baton Rouge Victory* was mined.[22]

The testimony revealed that the area where the vessel was mined is heavily infiltrated with the enemy and it takes the Viet Cong about 10 minutes to lay a command detonated mine in the water.[23]

The Court finds that there was no negligence on the part of the *Baton Rouge Victory's* officers in failing to request a mine sweeper to precede her up the river. Such a request would have been unprecedented and most probably would have been rejected since the river was regularly swept by minesweepers.[24]

## XVI

There is no evidence in the record for the Court to find that defendant failed to use sufficient technology and equipment to clear mines from the channel.

## XVII

No safety helmets were ever issued to the engine room crew nor were safety lines ever attached to the men and, although each man had a life jacket, no order had ever issued that all personnel wear them while in the engine room. Chief Kenyon testified that it was not desirable to wear a life jacket in the engine room because it was too cumbersome.[25]

Chief Kenyon, one of the two in the engine room who survived, testified that the explosion was of such force that he was blown about a foot off the floor plates; that the ship's two generators went out, leaving the engine room in total darkness; and that, although he called out, there were no sounds or any evidence of survivors there.[26]

Although defendant may have been negligent in failing to furnish its crew with safety helmets and lines and in failing to require the men to wear life jackets, plaintiff failed to prove such had a causal connection with Bishop's death.

## XVIII

Immediately after the explosion the engine room was flooded to a height of 15 feet above the operating platform and some 30 to 40 feet above the lower engine room floor.

Two minesweepers in the area immediately came to the rescue. LCDR McCullough, returning from a classified operation with two SEALES[27] aboard his LSM, arrived on the scene about an hour after the casualty occurred. LCDR McCullough and the two SEALES went down to the engine room area which was full of smoke and water. The master diver told McCullough that he would not dive under any circumstances for, in his opinion, to do so would be suicidal.

21. Testimony of Lt. Young, BM 1 Hunt and LCDR Robert F. McCullough.

22. BM 1 Hunt.

23. Testimony of LCDR McCullough.

24. Testimony of LCDR McCullough.

25. Testimony of Captain Carlson; deposition of Chief Kenyon, pp. 66, 68, 75.

26. Deposition, pp. 24, 63, 64.

27. Qualified Navy underwater divers.

From the evidence, we find that, under the circumstances, defendant did everything possible to effect a prompt rescue operation.

## XIX

■ Plaintiff contends that defendant was negligent in failing to disseminate information to the masters and crew of merchant vessels that there was danger of mines in the area. True, the information and/or instructions given to Captain Carlson re transiting the Saigon River made no mention of mines.[28]

Prior to August 23, 1966, only two ships had been mined and both of these incidents occurred while they lay at anchor at Ma Beh. The testimony revealed that the mining of the *Baton Rouge Victory* was the first known attempt to mine a ship while transiting the river.[29]

On August 23, 1966, the principal danger was from small arms fire.

We find that, under the facts and circumstances of this case, defendant was not negligent in failing to disseminate information to Captain Carlson as to the danger of mines in the area.

## XX

■ Assuming, arguendo, that the removal of the port boiler from the line rendered the *Baton Rouge Victory* unseaworthy, as contended by plaintiff, we find that plaintiff has failed to carry her burden of proving that such was the proximate cause of her husband's death.

## XXI

■ We find that Bishop's death was caused by hostile attack of an enemy in time of war and that plaintiff has failed to carry her burden of proving that any unseaworthiness of the *Baton Rouge Victory* or any negligence on the part of the defendant was causally related to Bishop's death.

## CONCLUSIONS OF LAW

### I

This Court has jurisdiction over this matter and venue is properly laid in the Eastern District of Louisiana.[30]

### II

■ The master of the S/S *Baton Rouge Victory* and, hence, the defendant was not the insurer of the safety of those aboard the vessel but had a duty to Bishop to take those precautions which reasonable care, intelligence and regard for his safety required.[31]

### III

■ "The fundamental principle in navigating a merchantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of the captain of a vessel must be confined in a mental strait-jacket. Of course, when movements are under military control, orders must be strictly obeyed, come what may. * * * After a disaster has occurred, it is not difficult for the expert to show how it might have been avoided, and there is always opportunity for academic discussion as to what ought or ought not to have been done; but the true approach is to endeavor, for the moment, to possess the mind of him upon whom rested the responsibility. * * *"[32]

### IV

We conclude that the explosion of the *Baton Rouge Victory* was the result of a command detonated mine placed by the Viet Cong and the death of John Alvah

28. Exhibits P–1; D–16, D–18.

29. Testimony of LCDR McCullough.

30. 46 U.S.C. § 781 et seq.; incorporating 46 U.S.C. § 741. 46 U.S.C. § 688.

31. Fraser v. United States, 72 F.Supp. 1 (D.C.Mass.–1947) affd. 167 F.2d 141 (CA 1–1948).

32. The Lusitania, 251 F. 715 (D.C.N.Y.– 1918).

Bishop was the result of, and proximately caused by, enemy action.[33]

## V

We conclude that the master of the *Baton Rouge Victory* was not negligent in failing to request that the channel be swept for mines immediately prior to that vessel's departure from Cap St. Jacques, where the military authorities were in complete control. Furthermore, the testimony shows that had Captain Carlson made such a request, it most probably would have been denied.[34]

## VI

We conclude that even if the absence of the port boiler rendered the S/S *Baton Rouge Victory* unseaworthy, plaintiff has not sustained her burden of proving, by a preponderance of the evidence, that such unseaworthiness was the proximate cause of Bishop's death.[35]

## VII

We conclude that plaintiff has failed to carry her burden of proving by a preponderance of the evidence that any unseaworthiness of the *Baton Rouge Victory* was the proximate cause of Bishop's death or that any negligence on the part of the defendant played any part, no matter how slight, in causing Bishop's death.

## VIII

Let judgment be entered in favor of defendant, United States of America, and against plaintiff, Mrs. Maxine Hilliard Bishop, individually and on behalf of her two minor children, John A. Bishop and Thomas Neal Bishop, dismissing plaintiff's suit at her cost.

33. Ryan v. United States, 57 F.Supp. 586 (ED Pa.–1944), 150 F.2d 366 (CA 3–1945).

34. Fraser v. United States, 167 F.2d 141 (CA 1–1948).

35. O'Neill v. United States, 157 F.Supp. 193 (DC Pa.–1957).