**RYAN v. UNITED STATES et al.**

No. 8837.

Circuit Court of Appeals, Third Circuit.

Argued April 6, 1945.

Decided June 6, 1945.

Philip Dorfman, of Philadelphia, Pa., for appellant.

John B. Shaw, of Philadelphia, Pa. (Thomas E. Byrne, Jr., and Krusen, Evans & Shaw, all of Philadelphia, Pa., on the brief), for respondent-appellee Lykes Bros. S. S. Co., Inc.

Before GOODRICH, STEPHENS, and McLAUGHLIN, Circuit Judges.

STEPHENS, Circuit Judge. (of Ninth Circuit)

This appeal is by libellant Ryan from a judgment dismissing his libel of the S. S. Syros, which ship was owned and operated by Lykes Bros. Steamship Co., Inc., during all of the time material to this action. (The libel uses "Brothers" in the corporate name instead of "Bros.", but no point is made as to this discrepancy.)

The case arises out of a personal injury sustained by libellant, a seaman on the "Syros". The issue is well stated by the

trial judge. "The theory of the action is negligence, and the narrow question for determination is whether the libellant sustained his injuries as a result of the failure of the Master of the steamship on which libellant was employed to have the life boats fixed in the position prescribed by the Coast Guard Regulations." The pertinent Coast Guard Regulation is: "153.3 Lifeboats on Ocean and Coastwise Vessels. (b) Readiness for lowering. Masters shall, with due regard to safety, cause all lifeboats attached to davits other than gravity davits to be properly griped (secured) in the outboard position as will allow immediate lowering in case of emergency. All boat covers are to be removed when the vessel is at sea and the guys rigged from the davit heads. All falls gear and equipment are to be ready for immediate use." Fed.Reg. Apr. 16, 1942, Vol. 7, No. 76 § 2908.

The life boats of the "Syros" were "attached to davits other than gravity davits," and appellant-libellant contends that the boats were not "griped in outboard position." He goes further and contends that had they been carried in outboard position, he could have left the ship safely and the injury would not have occurred.

The issue can be treated with clarity only after a more detailed account of the facts, and this may be done satisfactorily by quoting from the trial court's findings of facts.

"3. In March, 1942, prior to sailing from the United States there were installed upon the Steamship 'Syros' sliding lifeboat chocks to facilitate launching of the lifeboats. These chocks were designed and installed by Maryland Dry Dock Company.

"4. On the 16th day of April, 1942, the United States Coast Guard issued its Regulation [the regulation hereinabove quoted]: * * *.

"5. On May 26, 1942, the Steamship 'Syros' was one of a convoy of vessels sailing through the Barents Sea bound for Murmansk, U. S. S. R.

"6. The Steamship 'Syros' was sunk as a result of enemy action when torpedoed in the Barents Sea while bound for Murmansk, U. S. S. R., on May 26, 1942, at about 1.00 A. M. The vessel sank within two minutes or so after being torpedoed. [There is some evidence that the ship sank in about four minutes instead of two.]

"7. About 1:00 A. M. on May 26, 1942, the Libellant was in the messroom on the Steamship 'Syros' when the alarm bell sounded. He went to the galley and then through a passageway proceeding toward one of the upper decks. While he was thus proceeding a torpedo struck the ship. When the Libellant attempted to ascend to the boat deck, which was two decks above the messroom where he had been at the time of the sounding of the alarm bell, he was stopped by the Boatswain and ordered to release one of the life rafts since there was not time to launch a lifeboat. [Libellant claims that there was time enough before the ship sank to have launched a lifeboat had it been carried outboard in accordance with the regulation. To the extent that this point is alluded to in finding 7, this finding is wrong according to libellant.]

"8. The Libellant proceeded toward the stern on the port side but found that the life raft there had already been launched. He thereupon proceeded toward the starboard side of the vessel, his progress being impeded by the deck cargo which had been loosened and shifted by the explosion of torpedo and a second explosion, either of the ammunition cargo of the ship or a second torpedo. Libellant then tried to reach the poop deck; while he was thus proceeding the vessel sank and carried him below the surface of the sea; when he rose to the surface he noticed that two phalanges of the second finger of his left hand were missing.

"10. The sliding lifeboat chocks on the Steamship 'Syros' were in the outboard position and the davits were turned outward. [Libellant claims the lifeboat chocks were inboard.]"

In the circumstances we think the evidence shows that there was not time between the impact of the first explosion and the ship's sinking to launch a lifeboat however carried on the davits or however "properly griped." Certainly the boatswain, in the exigency, was justified in concluding that the prudent thing to do was to loosen the life raft instead of attempting to launch a boat. There is not a particle of evidence supporting a theory that it would take longer or be less safe to launch a lifeboat from the governmentally approved sliding chock installed on the "Syros" than from another kind of life boat carrier apparatus.

 There are two fatal weaknesses in libellant's case. The first one is that the life boats were carried on the "Syros" in

full conformity with the regulation, hence, no negligence was established. The second one is that even if the boats were carried negligently the negligence has not been established as the proximate cause of the injury.

The regulation requires that lifeboats shall be carried "properly griped in the outboard position." "Gripes" according to the American Merchant's Seaman's Manual, p. 252—1941, Rev.Ed., are "The fitting used to secure a boat in its stowage position on board ship." The evidence is conclusive that the lifeboats on the "Syros" were properly griped on sliding chocks at the edge of the shipside and that the davits were in the outward position. Even libellant testified as follows: "They [the lifeboats] were inboard, but they were in the outboard position on the chock. They were inboard, though."

In his testimony libellant was following the idea that "outboard" in the regulation means completely outward from the vessel side. From a common-sense viewpoint it seems entirely clear that it would have been impracticable, if not quite impossible, for any ship with any standard equipment, to carry the lifeboats in the Barents Sea in known enemy infested waters in any such manner. The boats would have soon thrashed themselves loose. Compliance with the actions prescribed by the regulation itself, it will be remembered, is premised upon the phrase, "with due regard to safety." The trial court concluded that the lifeboat's position on the sliding chock conformed to the terms of the regulation and this conclusion is supported by the plain wording of the regulation itself as well as by the testimony of the experienced second and third Mates which we deem it unnecessary to repeat here. In our opinion there is no room for any other conclusion.

The second fatal weakness of libellant's case is that even if we were to accept his theory as to the meaning of the regulation together with his conclusions that the boats were carried in a negligent manner, he could not recover. He could not recover because there is no substantial evidence connecting the alleged negligence with the injury as its proximate cause. No one, not even libellant himself, knew or has ever learned when or how the injury occurred. The trial court found that the injury was the result of enemy action. The very short period of time elapsing from the torpedo impact to the sinking, during which time another explosion occurred—the two tearing the ship practically in two and setting deck-stored objects free to shift with every change of deck angle—were packed so full of action and danger that one could well have suffered severe injury without taking account of it for the moment. The injury was noticed only when libellant rose to the water's surface and the minutes of dramatic action had passed. It hardly seems necessary to do more than state these facts to show that a wide and unbridged chasm exists between any reasonable certainty as to the cause of the injury and libellant's theory as to its cause.

We have come to all of our conclusions upon the basis of a trial de novo upon the record as appellant has requested us to do. If we were entertaining any doubts upon any material phases of the case, it would be necessary for us to determine what weight we should give to the findings of the trial court in arriving at our own conclusions, but in the circumstances this subject need not be pondered.[1]

We adopt the findings of fact, conclusions of law and decree of the trial court as our own.

The libel is dismissed.

---

[1] For weight to be given to trial court's findings in admiralty cases, see Alioto v. Imahashi, 9 Cir., 1940, 115 F.2d 324, 325; The Africa Maru, 2 Cir., 1931, 54 F.2d 265, 266; Yamashita Kisen K. K. v. McCormick Inter. S. S. Co., 9 Cir., 1927, 20 F.2d 25, 27; The Natal, 9 Cir., 1926, 14 F.2d 382, 384; The Ernest H. Meyer, 9 Cir., 1936, 84 F.2d 496, 501.