TATEM (LAWSON, Intervener) v. SOUTHERN TRANSP. CO.

Civil Action No. 3303.

District Court, E. D. Pennsylvania.
May 19, 1947.

See also, D.C., 5 F.R.D. 36.

Freedman, Landy & Lorry, of Philadelphia, Pa., for plaintiff.

Rawle & Henderson, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

The plaintiffs are personal representatives of three seamen who lost their lives when the seagoing tug Menominee was sunk by an enemy submarine by gunfire on March 31, 1942. The action is at law for damages and the trial was to the Court without a jury.[1]

The damage claims are based upon mixed charges of negligence and unseaworthiness, the chief of which are (a) allowing the tug to sail without adequate life saving equipment, (b) not routing the tug through inland waters for the first part of the voyage, (c) failure of the master to have the flotilla blacked-out at the time of the sinking and (d) failing to train the crew by drills in launching the lifeboat. Not pressed was a suggestion that the master was negligent in his direction of the vessel and crew when attacked. I acquit the defendant on the first count but hold it liable on the last three.

On the afternoon of March 30 the Menominee towing two coal barges and a lumber barge, left Norfolk bound for a New England port. At 2:30 on the following morning when about 6½ miles off the Delmarva Peninsula near Parramore Banks Buoy in the Atlantic Ocean she was attacked by shell fire from a surfaced enemy submarine lying inshore of her. There was little or no sea running. An overcast and rainy sky was clearing and a lastquarter moon, coming out at intervals, made for good visibility. Awakened by the first shot, the master sounded a general alarm, ordered the towing hawser to the first barge cut and attempted to escape by turning the tug back and running southwardly outside the barges, intending to head in after rounding the last one and get into shoal water on the banks, where the submarine probably would not follow. The submarine, however, overtook him shortly after he had passed the last barge and turned inshore. He then ordered the engines stopped and the submarine, which had been shelling both the tug and the barges, ceased firing. By that time, however, the tug had been hit four times, was taking in water and was in flames. Abandoning an ineffectual attempt to launch the lifeboat, the master ordered the buoyant apparatus thrown overboard and he and six others who had fallen or jumped into the sea clung to it. Five of these men died of exposure and cold during the night, one of whom was George Lawson, the mess boy. Two, the master and the chief engineer, were rescued the next day. They were the sole survivors of the 18 men on the tug except for one other seaman who had managed to keep afloat but who died shortly after being picked up. Tatem, the first assistant engineer, was last seen on deck by the chief engineer shortly after the shelling had ceased. Isaiah Lawson, the cook, was not seen at any time by either of the surviving witnesses.

[■] (a) The Menominee was seaworthy and was adequately supplied with life saving equipment.

The davits and gear for launching the lifeboat, while not of the most modern type, were in good condition and the boat was large enough to carry twenty persons. About a week earlier, while the tug was in the harbor, a gang of six men, mostly mechanics and shipyard laborers making repairs on the deck and being in no hurry, were able to swing out the lifeboat from its davits, ready for lowering, in 15 to 20 minutes—evidence corroborative of the testimony of the defendant's expert that under normal conditions and with proper practice six properly trained men could have launched it in less than 10 minutes, which

---

[1] There are also claims for war risk insurance but, by agreement of the parties, these are to be disposed of as though the subject of a separate action.

testimony I accept. Of course, in the excitement and confusion of a submarine attack it is very unlikely that it could have been done as quickly as that, even with a smooth sea; but the question now under consideration is the reasonable adequacy of the equipment.

In addition to the lifeboat and a full quota of life preservers, the Menominee carried emergency equipment sufficient to support at least 50 men in the water. There was, first, what has been confusingly called in the testimony both a life raft and a life float but what is properly described as buoyant apparatus. This was the thing to which the seven men clung during the night. It was not a makeshift affair but a piece of standard life saving equipment built by a recognized manufacturer and approved as extra emergency equipment for passenger vessels. In addition to that, there were two other fairly large (6x8) pieces constructed of crossed battens or latticework and three smaller (3x3) pieces constructed of balsa wood.

This equipment was not in compliance with the general Coast Guard regulations in force at the time. Those regulations called for life rafts or, in the alternative, life floats sufficient to accommodate all persons on board and none of the emergency equipment could be technically classed as such. The point of distinction is that a life raft or a life float as contemplated by the regulations is a piece of apparatus on which men can sit (not merely cling to) and so be out of the water, at least above their knees. The distinction is an important one because at least six men died of the effects of long immersion in the cold water.

However, two weeks before the Menominee sailed her equipment had been officially inspected and reported to the inspector in charge of hulls at Norfolk who, with full authority to accept substitutions, approved it as sufficient to meet government requirements.. Again the confusion in terminology appears. Commander Vose's note reads, "Improvised rafts or floats will suffice," but he knew what kind of buoyant apparatus was on the Menominee, he considered it better than an improvised float, and it is plain that he intended to and did approve that specific equipment.

■ Approval by the Coast Guard authorities is not conclusive on the question of sufficiency of equipment but it carries a good deal of weight. Taking into consideration the character of the equipment and the circumstances existing at the time the Menominee sailed, I think that proof of negligence or unseaworthiness in this regard is wanting.

■ (b) The defendant was negligent in not ordering the master to take the tow through inland waters as far as Delaware Bay.

Up Chesapeake Bay and through the Chesapeake and Delaware Canal to the Delaware Capes was a route by which the tug could have avoided some 100 miles of outside travel along the Atlantic coast. Although the defendant contended that it was not "a practicable or satisfactory route" it developed that this meant only that it took longer and was more expensive, principally because, with large barges, the tow had to be broken up and taken through the canal one barge at a time. There is no question, however, that it was entirely feasible. It had been used by the defendant and by other companies prior to the sinking for tows going to Philadelphia, and after the sinking it was used by tugs and tows bound for all points. In fact it appears that, later on, the Navy ordered it. It is conceded that the defendant was aware of the presence of submarines along the coast and knew that some ships had been sunk. The frank statement of the defendant's vice president that the expense involved was the main reason why the inland route was not made use of is a complete answer to the argument that the national emergency demanded that risks be taken in order to expedite transportation of essential materials. The master, who had up to this time always used the outside route, would not have been justified in incurring the additional expense for his company without specific orders, and no such orders were given.

Of course, it was impossible to avoid all danger, since the last part of the voyage had to be outside the New Jersey coast but the risk could have been cut down by at least a third and it is highly probable that the Menominee would not have encountered

the submarine which sank her had she taken the inland route.

I am unable to find any justification or excuse for the defendant's failure to direct the master to take the inland route.

■ (c) The flotilla had been showing lights from sunset until the attack. This was negligence for which the defendant is responsible.

Four eyewitnesses of the sinking were called. Two of them were barge captains and each testified that his barge and also the tug had running lights showing. The chief engineer was not questioned on the point. The master testified that he was blacked-out. He may have been referring to the tug only. If so, the evidence that there were lights on the barges is uncontradicted and whether that invitation to attack is chargeable solely to the barge captains or to the master as well is immaterial since all were the defendant's employees.

■ In a case involving a similar charge of negligence (In the Matter of The Petition of the United States, Waterman Steamship Agency, etc., So.Dist. of New York 1947, 69 F.Supp. 538, 542) Judge Goddard said: "The negligence of the master * * * while not the sole cause of the injuries sustained by claimants, was a substantial factor in bringing about a condition which resulted in their injuries and is sufficient to establish liability. Rey v. Colonial Nav. Co., 2 Cir., 116 F.2d 580, Restatement Torts, Sec. 449." This applies to the case now before the Court—not only to this, but to the other findings of negligence as well. Regardless of regulations, it can hardly be argued that it is not negligent for a flotilla of four vessels to attempt to pass, with running lights showing, through waters in which enemy submarines are known to be operating.

■ (d) No lifeboat drills had ever been held on the Menominee. The master and the chief engineer had had plenty of experience in launching lifeboats on other vessels and it may be assumed that the two A. B. seamen on board had also had. What experience the others had had does not appear. The Menominee's lifeboat was a large one and it took at least six men to launch it. The importance, in time of sudden peril and confusion, of having men thoroughly familiar with their stations and duties in launching a lifeboat is too obvious to require any discussion. It is not possible to say with certainty that, even with a trained and disciplined lifeboat crew, the Menominee's boat could have been put in the water in time to save the lives of the men, but the best judgment that I can form, from all the evidence, is that it could.[2] I hold that lack of the training which could have been obtained by lifeboat drills was a substantial factor in causing much of the loss of life which occurred. Captain Heynie had joined the Menominee as master on Feb. 25, 1942. Of the 17 men who composed the crew on March 31 at least 10 had sailed under him on the Menominee on one or more previous voyages. With one or two exceptions, the others had joined the vessel three or four days before she sailed when she was in the harbor at Norfolk. There was plenty of opportunity to drill and instruct the crew in the handling of the lifeboat. The defendant did not require it and failure to do so was negligence.

Judgment for the plaintiffs will follow upon the foregoing findings of liability.

---

[2] From the time she turned around and headed back, it took the tug about 10 minutes to get to the end of the line of barges, which would be, say 12 minutes after the attack began. The order to get the lifeboat ready for launching was given when the tug was halfway down the line, about 2:37. The order to stop the engines came shortly after the tug had headed inshore, or at about 2:45. The last shell was fired about the time the tug lost headway and stopped, or about 2:48. The master ordered the men working at the lifeboat to give it up and get the buoyant apparatus overboard very shortly after that, or at 2:50. He himself was knocked into the sea about 10 minutes after the tug stopped, or at 2:55. After it had been abandoned it burned for at least half an hour until it sank, which would be not earlier than 3:30. It thus appears that the crew had approximately 23 minutes in which to launch the boat, assuming that all were forced to leave the tug at the time the master went overboard; although, as a matter of fact, the chief engineer and some of the crew were on board 3 or 4 minutes longer than that.