**PALMER et al. v. UNITED STATES.**

**McGRATH v. SOUTH ATLANTIC S. S. LINE.**

United States District Court
S. D. New York.
Sept. 8, 1949.

Jacob Rassner, New York City (Bertram J. Dembo, New York City, of counsel), for libelants.

John F. X. McGohey, United States Attorney, New York City (Edward R. Downing, Sp. Atty., Department of Justice, Brooklyn, N. Y., Martin J. Norris, Sp. Asst. to U. S. Atty., New York City, of counsel), for respondent United States.

S. H. KAUFMAN, District Judge.

This libel is brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., for injuries sustained by libelants Bartin and Champlin and for the death of libelants Palmer's and Funken's intestates when the Liberty ship SS Henry Bacon was torpedoed by enemy bombers and sank in the waters of the north Atlantic on February 23, 1945.

It was consolidated at the trial with the libel in the case of Flora Haviland McGrath against South Atlantic SS Line, without prejudice to the rights of respondent there to assert certain defenses, which were raised by exceptive allegations. The libel in the McGrath case was also brought for death of libelant's intestate arising from the sinking of the SS Henry Bacon.

By order of the court the issues of liability only were tried, the question of damages being reserved until after a decision herein.

Libelants' intestates Lynn R. Palmer, Frederick C. Funken and Donald F. Haviland, and libelants George Bartin and Lawrence E. Champlin were employees of the United States of America and members of the crew of the SS Henry Bacon.

The SS Henry Bacon was owned by the United States of America. Between November 9, 1944 and November 16, 1944, it was under annual inspection by the United States Coast Guard, Marine Inspection Division, at the Port of Boston. The hull inspector examined and tested fire fighting and all lifesaving equipment, including lifeboats, life rafts, individual life preservers, provisions and appurtenances required in lifeboats and the vessel's lifeboat launching equipment, comprising all davits and blocks and falls. The SS Henry Bacon was equipped with three standard rowing lifeboats with a capacity for 31 persons each and one motor lifeboat with a capacity for 25 persons. The No. 1 and No. 3 lifeboats were located on the starboard side of the boat deck, while the No. 2 and No. 4 lifeboats were on the port side of the boat deck, the No. 4 boat being equipped with a motor. In addition, the vessel was equipped with four life rafts, mounted on steel structures, two of which were located on each side of the forward deck and two on each side of the aft deck. In each pair of these rafts, one had a carrying capacity of 20 persons and the other a capacity of 18 persons. There were also two smaller rafts on deck with a carrying capacity of 15 persons each. All the rafts could be released automatically and were inspected and approved.

The Henry Bacon was supplied with 55 life jackets or life preservers for the members of the crew, with 25% additional ones located in two boxes on the boat deck, and 18 ring buoys. In addition, the armed guard were provided with their own life preservers. All the boat davits were examined for fractures, bends or breaks and found in perfect condition. The vessel's

holds and bilges were examined for leaks in the vessel's hull and bottom and were found in good condition. The steering apparatus, including the rudder, quadrant, steam steering engine, manual steering and telemotor system were examined and tested by both the hull and boiler inspectors in the steering engine room and were found in satisfactory condition and good working order.

Before leaving Boston a fire drill and a boat drill were conducted, with at least one boat fully manned and launched in the water. The vessel's boilers, main engine, fire pumps, evaporator, circulating pump, generators, telephone system and steering apparatus, together with appurtenances, were inspected and approved. The telemotor pipe lines were constructed of copper tubing.

An assistant engineer for the vessel's agent and representing the United States was aboard the Henry Bacon supervising the repairs which were required to make the vessel seaworthy in compliance with the Marine Inspection Division of the Coast Guard. The vessel was declared in A-1 seaworthy condition before she left the Port of Boston, and a certificate to that effect was issued on November 16, 1944.

The vessel sailed from Boston on November 17, 1944 for New York via the Cape Cod Canal, Long Island Sound and the East River. It carried 280 tons of permanent rock ballast and made the voyage in good weather and without any incident. The vessel arrived in New York on November 19, 1944, at Pier 60, North River, and during its stay in New York certain minor repairs were effected under the personal supervision of the Government's representative and the ship's chief engineer.

At the Port of New York, on November 21, 1944, shipping articles were signed.

When the SS Henry Bacon departed from the Port of New York on December 4, 1944, she was in A-1 seaworthy condition, laden with war cargo, and fully equipped and supplied for a trans-Atlantic voyage. The vessel sailed in convoy bound for the United Kingdom for orders. The weather was fair and the seas were moderate. The lifeboats were rigged outboard and fire and boat drills were conducted weekly after putting to sea.

The vessel arrived in the United Kingdom on December 18, 1944, and after calls at several intermediate ports for naval orders and routing instructions, the vessel departed from Scotland in convoy for Murmansk, Russia. The voyage was made under fair weather conditions and the SS Henry Bacon arrived at Murmansk (Kola Bay) on January 17, 1945, where her cargo was discharged.

While at the Port of Murmansk, 2,000 tons of sand ballast were placed in the Nos. 2, 3, 4 and 5 holds of the Bacon. At the request of the British and American military authorities, 19 Norwegian refugees were placed aboard the Bacon for transportation to the United Kingdom.

The Bacon departed from Murmansk on February 17, 1945 with a draft of 14 feet forward and 18 feet aft, in a convoy of about 40 ships. The vessel was fully manned with a crew of approximately 41 seamen and a Naval armed guard complement of about 28 enlisted sailors. On the day of departure, the Bacon's steering apparatus was tested and found in good working order and she was fully equipped, manned and in A-1 seaworthy condition.

Two days out the Bacon ran into heavy weather which culminated in a severe storm during the night of February 19th. Seas of thirty to forty feet, driven by forty-five mile an hour winds, swept across her main deck, causing the ship to pitch and roll. Other vessels were separated from the convoy and displayed distress signals which were visible aboard the Bacon. The Bacon herself temporarily lost contact with her companion ships when she suffered engine difficulties, but regained her position and continued voyage with the convoy.

More inclement weather was encountered on the 21st, and by the night of the 22nd the Bacon was in the midst of a severe Arctic storm. Winds of seventy-five miles per hour buffeted the ship and waves as high as forty feet lashed the main deck, the boat deck, and even the flying bridge. The binnacle was washed off the poop deck by the seas; lifeboat No. 4 was thrown from

its cradle onto the deck with its bow stove in and its forward davit damaged.

A breakdown in her telemotor system forced the Bacon to separate from the convoy during the course of the storm on the night of the 22nd. Repairs were effected in rolling seas within two hours and an attempt was made to overtake the convoy, which, by midnight of February 22nd, was still in sight not more than a quarter of a mile off, as the blue stern light of one of its vessels could be discerned from the Bacon's decks. But by three-thirty of the morning of the 23rd, the faint silhouettes of the rocking hulls of the convoy were observed for the last time as the Bacon lost contact with the other ships when her motors stopped and she started to drift.

When the Bacon again got under way, she pursued the course set for the convoy but by early afternoon of the twenty-third as yet no sign of other vessels had been observed although a lookout had been posted in the crow's nest to maintain constant and vigilant watch. Wartime regulations forbade the use of radio communication, and the Captain, after conferring with the ship's officers, determined to retrace the Bacon's course for an hour on the chance that the convoy had been overtaken and passed during the calm weather which followed in the wake of the storm. Shortly thereafter, at about three-fifteen in the afternoon, the Bacon was attacked by twenty-three JU 88 German torpedo bombers.

After a valiant but futile fight in which three enemy planes were shot down by her armed guard, the Bacon succumbed to an aerial torpedo which struck her port side aft near No. 5 hold. Her side was opened to the sea by the explosion and ten minutes later orders were given to abandon ship.

Lifeboat No. 1, containing the Norwegian refugees and several of the crew, and lifeboat No. 2, fully loaded with members of the crew, were successfully launched. Lifeboat No. 4 incapacitated from the storm of the prior day, was unfit for use. An attempt to launch lifeboat No. 3 ended in failure when one of the men on the forward bitt let go, the fall causing the boat to capsize. Two life rafts had been destroyed by the explosion of the torpedo, but two other life rafts and a donut raft were set afloat.

Approximately forty-five minutes after she was abandoned, the SS Henry Bacon, her captain still aboard, went down by the stern. Survivors were picked up two hours later by three British destroyers responding to an SOS wired from the Bacon before she sank.

 It is claimed by libelants that the Bacon was unseaworthy because the breakdown of the telemotor system caused her to leave the protection of the convoy and subjected her to enemy attack. Sufficient evidence is lacking, however, to support this contention. The evidence is that the Coast Guard certificate issued to the Bacon after her annual inspection in November of 1944 indicated that the ship was in seaworthy condition. While not conclusive, the approval by the Coast Guard of the equipment aboard a vessel is entitled to considerable weight. Tatem v. Southern Transp. Co., D.C., 72 F.Supp. 44, 46, affirmed 3 Cir., 166 F.2d 1020.

 Nor was the Bacon unseaworthy or her masters negligent in failing to provide sufficient ballast for the voyage from Murmansk. Captain Mirteenes, an employee of the War Shipping Administration, testified that 2,000 tons of temporary ballast was the Government requirement for Liberty ships in transatlantic crossing during the winter of 1945. He stated that, in his opinion, ballast of 2,000 tons would render a vessel of the Henry Bacon type seaworthy to negotiate the treacherous seas around Murmansk.

The testimony of Kapanaux, assistant marine superintendent for the South Atlantic Steamship Line, which acted with respect to the Bacon under a General Agency Service Agreement, indicated that a mean draft of 10 feet would render a Liberty ship reasonably safe to make a transatlantic voyage. Captain Mirteenes stated that a ship with a mean draft of 16 feet would be a seaworthy vessel, while Captain Sheridan declared that the draft of 14 feet forward and 18 feet aft of the

Bacon was proper for the trip from Murmansk to the United Kingdom. Libelants' own expert witness, Captain McDonagh, testified that the Bacon could not have covered the distance from Murmansk to the place of torpedoing, a distance of 800 miles, at an average speed of seven or eight knots per hour, had her propeller been out of the water because of a low draft and insufficient ballast.

The evidence compels the conclusion that the Bacon's telemotor system was in seaworthy condition and that sufficient ballast had been placed aboard at Murmansk to negotiate the anticipated voyage with safety, in the absence of extraordinary circumstances. Although evidence indicated that rolling in heavy seas would not of itself normally cause a telemotor system to get out of order, the testimony on cross-examination of Captain Sheridan, the expert witness of respondent, supports the conclusion that the severe storms encountered by the Bacon on her voyage caused the damage to the telemotor system.

■ Libelants claim that the master of the ship was negligent in failing to keep the Bacon in convoy position when the telemotor system broke down. There was clearly no negligence here, for the master promptly switched to the manual steering apparatus when the telemotor became damaged. However, because the binnacle had been swept from the poop deck by the seas during the storm, it was impossible to steer by compass, and the Bacon was forced to leave the convoy to head into the wind and seas where she could be guided by the stars.

■ The evidence is insufficient to find that the Bacon had a list caused by leaks in her hold or was in any other way unseaworthy.

■ Libelants assert that the Master of the Bacon erred in retracing his course in an endeavor to come upon the convoy during the afternoon of the 23rd. It is difficult to see, however, how the Bacon would have escaped destruction by the enemy had she adhered to the original course or gone to the straggler's position.

Furthermore, the decision of the Master in reversing his course was done in his discretion after discussion with the officers of the vessel and, however unfortunate it may appear when viewed after the event, cannot be declared negligent at this time unless arbitrary or unreasonable, Roberts v. United Fisheries Vessels Co., 1 Cir., 141 F.2d 288, certiorari denied 323 U.S. 753, 65 S.Ct. 81, 89 L.Ed. 603; Johnson v. United States, 2 Cir., 74 F.2d 703, which it was not.

■■ The final claim that liability rests upon the respondent is based upon the negligent maintenance and unseaworthiness of the lifesaving equipment aboard the Bacon. There is no more proof to sustain these contentions, however, than those already discussed. The Coast Guard inspection in November, 1944 included a close examination of all life saving equipment. Nor were the lifeboats negligently maintained by being rigged inboard in their cradles instead of outboard ready to be lowered. The manner of carrying lifeboats rests in the master's discretion after consideration for the safety of the boat and crew. Not only did the rough seas around Murmansk amply justify the master's decision to keep the lifeboats inboard, but despite this precautionary measure lifeboat No. 4 suffered severe damage from the seas. Finally, it has not been shown how the rigging of the lifeboats inboard was in any way causally related to the injuries complained of. Ryan v. United States, 3 Cir., 150 F.2d 366.

■ It was no act of negligence for the Captain not to repair the damaged lifeboat immediately for it was clear that the trouble to the steering apparatus warranted his immediate attention. The fact that lifeboat No. 4 was never repaired sufficiently to be launched was explained by the libelant, Champlin, who stated in his deposition that the davit remained damaged because there was no replacement, as merchant vessels did not customarily carry extra davits aboard.

The lifesaving equipment under normal circumstances was sufficient for the crew,

the armed guard and the nineteen refugees who boarded the Bacon at Murmansk.

 For whatever reason the forward bitt of lifeboat No. 3 was dropped during its launching, insufficient evidence is presented to show that it was caused by negligence or unseaworthiness. Nor was there negligence in failing to hold life drills, as credible testimony indicated that such drills were held regularly aboard the ship.

Libelants have failed to show that either negligence or unseaworthiness was a competent producing cause of the injuries and deaths herein alleged and therefore the libels must be dismissed.

 In addition, in the case of Flora Haviland. McGrath against South Atlantic Steamship Line, the evidence shows that respondent there was merely an agent of the United States of America in accordance with the standard form of General Agency Service Agreement and thus the libel is improperly brought against that respondent. Cosmopolitan Shipping Company, Inc., v. McAllister, 337 U.S. 783, 69 S.Ct. 1317.

Findings of fact and conclusions of law are filed herewith.

### Findings of Fact.

1. At all times herein material, the Liberty ship SS Henry Bacon was owned by the United States of America.

2. At all times herein material, the South Atlantic Steamship Line acted as agent of the United States of America with respect to the SS Henry Bacon in accordance with the usual form of General Agency Service Agreement. It had no part in the actual management or navigation of the ship.

3. Lynn R. Palmer, Frederick C. Funken, Donald F. Haviland, George Bartin and Lawrence E. Champlin were employees of the United States of America and members of the crew of the SS Henry Bacon.

4. Between November 9 and November 16, 1944, the SS Henry Bacon underwent an annual inspection by the United States Coast Guard, Marine Inspection Division, at the Port of Boston. The Coast Guard issued a certificate of inspection on November 16, 1944 and at that time the ship was in A-1 condition.

5. The SS Henry Bacon left Boston on November 17, 1944 and after intermediate stops arrived in Murmansk, Russia on January 17, 1945.

6. On February 7, 1945, the SS Henry Bacon sailed in convoy from Murmansk, Russia. She was manned with a crew of about 41 seamen and a Naval armed guard complement of about 28 enlisted sailors. She also had 19 Norwegian refugees aboard.

7. Life boat drills were held regularly aboard the SS Henry Bacon.

8. The ballast of 2,000 tons, which had been placed aboard the SS Henry Bacon at Murmansk was sufficient to negotiate the voyage with safety.

9. On the day the ship left Murmansk, her steering apparatus was tested and it was in good working order.

10. There were no leaks in the ship's hold.

11. The SS Henry Bacon was equipped with four lifeboats, with a capacity of 118, four life rafts, with a capacity of 76; and two smaller rafts, with a capacity of 30. The SS Henry Bacon also carried about 55 life preservers for the crew, with 25% additional ones located on the boat deck, and 18 ring buoys. In addition, members of the armed guard had their own life preservers. The life saving equipment was in good condition when the ship left Murmansk and the lifeboats were rigged inboard in their cradles.

12. During the voyage the SS Henry Bacon encountered severe Arctic storms, as a result of which the binnacle was washed off the poop deck, lifeboat No. 4 was thrown from its cradle onto the deck with its bow stove in and its forward davit damaged, and the telemotor system broke down.

13. The breakdown in the telemotor system forced the SS Henry Bacon to separate from the convoy during the night of February 22, 1945. Repairs were ef-

fected and an attempt to overtake the convoy by following the course set was unsuccessful, although a lookout was posted.

14. The Captain, after conferring with the ship's officers, ordered the SS Henry Bacon to retrace her course on the chance that the convoy had been passed.

15. Wartime regulations forbade the use of radio communication.

16. At approximately 3:15 P.M. on February 23, 1945, the SS Henry Bacon was struck by an aerial torpedo due to enemy action and sank in about 45 minutes.

17. Two lifeboats, two life rafts and one of the smaller rafts were successfully launched. An attempt to launch lifeboat No. 3 ended in failure. Lifeboat No. 4 was disabled from the storm of the prior day. Two life rafts were destroyed by the explosion of the torpedo. Survivors were picked up by British destroyers about two hours later.

18. Lynn R. Palmer, Frederick C. Funken and Donald F. Haviland died and George Bartin and Lawrence E. Champlin sustained injuries in the disaster.

### Conclusions of Law.

1. This court has jurisdiction of the parties and the subject matter of this action.

2. Libelants have failed to prove by a fair preponderance of the evidence that respondents were responsible for the deaths of Lynn R. Palmer, Frederick C. Funken and Donald F. Haviland and the injuries sustained by George Bartin and Lawrence E. Champlin by reason of the unseaworthiness of the SS Henry Bacon or the negligence of her master, officers or crew members.

3. Upon the evidence adduced, the enemy air attack was the sole cause of the sinking of the SS Henry Bacon and the resulting deaths and personal injuries.

4. Respondents are entitled to a decree dismissing the libels.

5. In the case of Flora Haviland McGrath against South Atlantic Steamship Line, respondent is entitled to a decree dismissing the libel on the additional ground that, as General Agent of the United States, it is not liable for the acts alleged.