Petition of **TRAWLER SNOOPY, INC.,**
for Exoneration from, or Limitation of
Liability as Owner of the **F/V SNOOPY.**
No. 249.

United States District Court
D. Maine, S. D.
May 22, 1967.

Philip G. Willard, Portland, Me., Eugene Underwood, New York City, for petitioner.

Nathan Greenberg, Boston, Mass., Donald A. Leadbetter, Portland, Me., Robert P. Malone, Myron Boluch, Morris D. Katz, Boston, Mass., John Evans Harrington, Bangor, Me., Bennett, Schwarz & Reef, Portland, Me., for claimants.

## OPINION AND ORDER
## OF THE COURT

GIGNOUX, District Judge.

On July 23, 1965 the F/V SNOOPY, while dragging for scallops off the coast of North Carolina, caught a torpedo in her port drag, exploded and sank. As a result of the explosion and sinking, eight members of her crew, including the captain, died, and the four surviving crew members sustained personal injuries. In the present proceeding, petitioner, the owner of the SNOOPY, seeks exoneration from liability or, in the alternative, limitation of liability under 46 U.S.C. §§ 183–188 (1964) (Limitation of Shipowner's Liability Act),[1] and the personal representatives of the deceased crew members and the surviving crew members have filed claims, aggregating $3,450,000, for the deaths and personal injuries resulting from the sinking. By agreement of the parties, the Court has heard the evidence and considered the written and oral arguments of counsel on the issues of liability and limitation of liability, and now makes its findings of fact and conclusions of law, and directs entry of its judgment, as follows:

At all times material hereto petitioner, Trawler Snoopy, Inc., a Maine corporation, was the owner and operator of the F/V SNOOPY, a wooden dragger, whose home port was Portland, Maine. The captain of the SNOOPY was Edward F. Doody, of Scarborough, Maine, a fishing vessel captain of many years experience.

Some time during May 1965 the SNOOPY left Portland for Cape May, New Jersey and the scallop fishing grounds off the coast of North Carolina. On July 19, 1965, the SNOOPY departed Cape May on her fourth trip to the scallop beds located approximately 45 miles east of Currituck Beach, North Carolina. On July 23, 1965, at approximately 9:15 p.m., at latitude 36°20' north, longitude 74°55' west, while the SNOOPY was in the company of about 40 other scallopers, she commenced to pull in her catch. The starboard drag had already been hauled back and was on the starboard rail, but when an attempt was made to bring the port drag aboard, it was found that a torpedo was hanging vertically by its propeller or propeller guard on either the sweep chain or a tickler on the exterior of the chain bag.[2] The weight of the torpedo, which

---

1. 46 U.S.C. § 183(a) (1964) provides in pertinent part:

   (a) The liability of the owner of any vessel, whether American or foreign * * * for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

2. All four of the surviving crew members, who were the only living eye witnesses to

has been variously described as between six and eleven feet long and about two and one-half to three feet in diameter, was such as to cause the cable to slip on the winch drum.

Captain Doody was on watch in the wheelhouse, and under his direction, an initial effort was made to lift the drag high enough to bring it aboard. The crew was unable to accomplish this because the winch could not lift the torpedo high enough to clear the rail. An attempt was then made to dislodge the torpedo by securing a line from the torpedo to a gallows stay overhead and then dropping the drag out from under it, but this effort also proved to be unsuccessful. After the failure of these attempts, Captain Doody again directed the crew to try to bring the torpedo aboard. As this was being done, the torpedo swung away from the vessel as the SNOOPY rolled in a swell, swung back, struck the rail, and exploded. Captain Doody and seven of his crew lost their lives. The four survivors were quickly rescued by other scallopers near by. The SNOOPY herself was completely destroyed.[3] The efforts to free the torpedo lasted about 15 minutes.

■ There is no substantial dispute between the parties as to the legal principles which are applicable in a limitation proceeding such as this. The Supreme Court long ago established that the issues to be determined are "[f]irst, whether the ship or its owners are liable at all * * * and secondly, if liable, whether the owners are entitled to a limitation of liability * * *." Providence & N. Y. S. S. Co. v. Hill Mfg. Co., 109 U.S. 578, 595, 3 S.Ct. 379, 390, 27 L.Ed. 1038 (1883); Hartford Acc. & Indem. Co. of Hartford v. Southern Pac. Co., 273 U.S. 207, 215, 47 S.Ct. 357, 359,

71 L.Ed. 612 (1927). If no liability is found to exist, the petitioner is entitled to a decree of exoneration, and there is no need to consider the claim to limitation, for "[i]f no liability exists there is nothing to limit." The 84-H, 296 F. 427, 431 (2d Cir. 1923); Southern Pac. Co. v. United States, 72 F.2d 212, 215 (2d Cir. 1934); United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189 (1st Cir. 1967). It is also settled that on the issue of liability the claimants have the burden of proof, while on the limitation issue the petitioner has the burden of proof. The 84-H, supra; Southern Pac. Co. v. United States, supra.

Applying these principles, the Court is compelled to conclude, upon the entire record in this case, that claimants have failed to sustain their burden of proving that the sinking resulted from any fault of the SNOOPY or its owner. Petitioner is therefore entitled to exoneration, and there is no occasion to consider its right to limitation.

■ In their effort to establish petitioner's liability, claimants argue that petitioner was negligent, or its vessel was unseaworthy, in three respects. Claimants first suggest that petitioner's failure to equip the SNOOPY with a spare drag both constituted negligence and rendered the vessel unseaworthy. It is undisputed that the SNOOPY had not carried a spare drag for about six months prior to the accident. However, claimants' evidence fails to establish any causal connection between the absence of a spare drag and the sinking of the SNOOPY. To support a finding that there was such a connection there should be at least some proof that Captain Doody took, or refrained from taking, some action to get rid of the torpedo *because* there was no spare drag. Cf.

---

the accident, testified at the trial. Of these, only the mate, Leavitt, thought that the torpedo was inside the chain bag, in a horizontal position. Lindahl and French both testified that the torpedo was hanging in a vertical position on the outside of the bag. The cook, Martin, slept through the entire incident.

3. The limitation fund is $1,548.10. In accordance with Fed.R.Civ.P. Supplemental Rule F (1) petitioner has deposited this sum with the Court as the value of its interest in the vessel.

United States v. Sandra & Dennis Fishing Corp., supra at 193, n. 3. There is no such evidence here.[4] Moreover, claimants have presented no evidence indicating that any consideration of safety required that a spare drag be carried. In fact, the record is clear that the reason why scallopers often carry a spare drag is an economic one. Every witness who testified on the point stated that the purpose of carrying a spare drag was to avoid the risk of having to abort a trip in the event a drag in use should foul on some under-water obstruction and be lost, since it is generally not profitable to continue scalloping with only one drag.[5] No witness testified that the absence of a spare drag created any hazard for a vessel or its crew.

Although at trial claimants attempted to prove a practice among scallopers of carrying a spare drag, even if such a practice would be relevant, the evidence fell far short of establishing any uniform and general custom in this respect. Cf. Anglo-Saxon Petroleum Co., etc. v. United States, 222 F.2d 75, 77 (2d Cir. 1955), Sickelco v. Union Pac. R. R. Co., 111 F.2d 746, 748 (9th Cir. 1940). True, Captain Normand Maillet and Captain Edward Perry, both experienced scallopers, who testified as expert witnesses on behalf of claimants, stated that most scallopers carry a spare drag in order that they may continue fishing if one is lost, but this evidence was persuasively countered by that of Captain Magnus Thompsen, also an experienced scalloper, who testified as an expert witness for petitioner. Captain Thompsen stated that for about five years, since the advent of the modern all-steel welded drags of the type which were aboard the SNOOPY, it has not been customary for scallopers to carry a spare drag. Captain Thompsen explained that the reason for this is that the new drags are "too big and too clumsy and too heavy"; that it is necessary to store them on the whaleback; and that to do so involves too great a risk of injury to members of the crew working in the bow or attempting to rig one for use at sea. Captain Thompsen further testified that there is no need to carry a spare drag when scalloping in the southern waters where the SNOOPY was fishing because the bottom is smooth and relatively free of under-water obstructions.[6]

In sum, the present record abundantly establishes that the sole purpose of carrying a spare drag aboard a scalloper is economic; that whether or not one should be carried is a matter of judgment; that the need for a spare drag in the waters where the SNOOPY was fish-

---

4. In fact, the record indicates that in all probability Captain Doody was not influenced by the lack of a spare drag. The mate, Leavitt, testified that the SNOOPY could have continued fishing profitably with only one drag if the drag with the torpedo had been abandoned. Captain Thompsen testified to the same effect, and undoubtedly Captain Doody was aware of this fact. The record also discloses that the SNOOPY had between 17,000 and 18,000 pounds of scallops aboard when she was sunk, which indicates that she had been averaging about 2,500 pounds per drag per day during the three and one-half days she had been out. Her average catch on her three prior trips in the same waters had been 24,250 pounds per trip. The average trip lasted six or seven days. Had the SNOOPY continued scalloping for two and one-half more days with one drag, the same rate of catch per drag would have brought in another 6,250 pounds for a total catch of 24,000 pounds, almost equal to the average of the last three voyages, and more than 3,000 pounds better than the last preceding voyage, when her catch was 20,726 pounds. As Leavitt testified, even 17,000 to 18,000 pounds is "a pretty good catch anywhere"; indeed, more than the SNOOPY had brought home on 26 out of her 33 voyages to Georges Bank in the year and one half before she went south.

5. However, see n. 4, supra.

6. It is significant that at least one of SNOOPY's old drags, which had been replaced by a new one before she went south, was lying, in plain sight, on the wharf within 50 to 100 feet of the SNOOPY's berth, when she sailed from Portland in mid-May. Had Captain Doody or any member of the crew felt that a spare drag was either necessary or desirable, one was thus readily available, and yet no one suggested that it be placed aboard.

ing at the time of the accident was minimal; that the presence of a spare drag aboard the SNOOPY would have involved a substantial risk of injury to members of the crew engaged in their normal duties; that no relevant and binding custom and practice with respect to the carrying of a spare drag by scallopers has been shown; and that there was no causal connection between the absence of a spare drag and the sinking of the SNOOPY. It follows that the fact there was no spare drag aboard does not render petitioner liable.

■ Claimants next contend that petitioner was negligent because of its failure to warn the SNOOPY's captain and crew of the danger of picking up a torpedo in the area in which they were fishing. But to establish such negligence it is necessary for claimants to show that petitioner had actual or constructive notice that there was a risk of catching a torpedo in the waters where the SNOOPY was. Connolly v. Farrell Lines, Inc., 268 F.2d 653, 655 (1st Cir.), cert. denied, 361 U.S. 902, 80 S.Ct. 208, 4 L.Ed.2d 158 (1959); Poignant v. United States, 225 F.2d 595, 596 (2d Cir. 1955); Shannon v. Union Barge Line Corp., 194 F.2d 584, 585 (3d Cir. 1952).

■ No such proof is present here. The record is devoid of evidence that petitioner had any reason to suspect there might be a torpedo in the area.

The incident was apparently without precedent, at least on the Atlantic Coast. The SNOOPY had made three prior trips to the area, and approximately 40 other scallopers, almost the entire Canadian and New England scalloping fleets, were dragging in the same area. Both Captain Maillet and Captain Thompsen, who were fishing on their own vessels close by the SNOOPY, testified that they considered the area to be safe.

Claimants suggest that various official United States Government charts and publications placed petitioner on notice of the presence of torpedoes in the area, but an examination of these charts and publications discloses that they contained no warning of danger where the SNOOPY was fishing. Two Government charts warn of dangers elsewhere, but neither indicates any hazard where the SNOOPY was.[7] The local Notices to Mariners issued by the Coast Guard contain not a single word indicating the possible presence of torpedoes in the area. The pertinent Atlantic Notice to Mariners, prepared jointly by the Coast Guard and the Navy "for the improvement of the means for navigating safely the vessels of the Navy and the Mercantile Marine and for the benefit of navigation generally," also contains no warning of torpedoes in the area. The latter publication does contain a general "Warning to Fishermen," but this warning, which is set out in the margin,[8] is

---

7. A legend in the upper right hand corner of U.S.C. & G.S. Chart No. 1109 (Cape May to Cape Hatteras) warns against anchoring or bottom fishing in two "Danger Areas" and against "Explosives Dumping Areas" at latitude 37°15′ north, longitude 74°20′ west and at latitude 36°30′ north, longitude 74°15′ west. But one of these Danger Areas is located 160 miles away at the entrance to Delaware Bay and the other is located at the entrance to Chesapeake Bay, 60 miles away, and the two Explosives Dumping Areas are respectively 60 and 30 miles from where the SNOOPY was fishing.

U.S.C. & G.S. Chart No. 1,000 (Cape Sable to Cape Hatteras) warns of various wrecks, the nearest about eight miles north of SNOOPY's torpedo; several explosives dumping areas, the nearest 30

miles to the east; and two unexploded depth charges, the nearest 35 miles to the north.

8. *UNITED STATES—Warning to fishermen.*—A vessel having an unidentified heavy object in its net should move to shoaler water before recovering the net, in case the object proves to be a depth charge.

Aerial bombs, recognizable by fins on one end and a small propeller on either end should not be jettisoned, as this may result in detonation. It is recommended that any object, identified as an aerial bomb be brought aboard horizontally with minimum handling, laid flat on the deck, and carefully secured. The nearest naval or Coast Guard activity should be notified for directions as to disposition.

more persuasive for what it does not say than for what it does. First, it warns fishermen who net a heavy object to move to shoaler waters in case the object proves to be a depth charge; next, it advises what to do with an aerial bomb; it then refers to depth charges again; and finally, it refers to floating objects believed to be mines. But there is no mention of torpedoes, and there is no warning anywhere, even the slightest, as to what to do with a torpedo. Plainly, the Navy and the Coast Guard were conscious of a duty to warn navigators, including fishermen, and went to considerable trouble and expense to do so. The very fact that this publication contains no warning about torpedoes, nor of any other dangerous condition in the area, persuasively indicates that those in the best position to know did not foresee any such hazard as the SNOOPY encountered.

On the present record, claimants have failed to show that petitioner had actual or constructive notice of the risk of picking up a torpedo in the area where the SNOOPY was fishing, or that petitioner was in any way negligent in failing to warn the captain and crew that such a danger might exist.

Claimants' final contention is that Captain Doody was negligent in the manner in which he attempted to deal with the emergency with which he was confronted.[9] They suggest that Captain Doody either should have cut the main cable and let the drag go, or, in the alternative, should have lowered the drag and then cut the cable and buoyed off the drag, a course of action which the surviving crew members and Captain Perry testified at the trial would have been a "safer" procedure. Conceding that the event may have proved that Captain Doody made the wrong decision in attempting to bring the torpedo aboard, the Court cannot agree that the course of action he chose was negligent under the circumstances.

■ The standard of care required of captains of fishing vessels is that of the ordinary careful and prudent man under like circumstances. Roberts v. United Fisheries Vessels Co., 141 F.2d 288 (1st Cir. 1944); Fraser v. United States, 167 F.2d 141, 143 (1st Cir. 1948). In Roberts the captain of a fishing vessel was charged with negligence because he did not hoist a signal to recall his dories when a sudden storm arose. The court sustained a jury charge as follows:

If, on the other hand, you find that the storm was of a type where the captain or any other person, acting in a reasonably careful and prudent manner considering that they were out there on the high seas to catch fish and make money would have done just exactly as he did, then that would not be evidence of negligence and to determine this point you have got to sift the evidence and ascertain just what the truth of the situation was.

Id. at 291. The court went on to say that:

The test or standard to be adopted in determining whether the care used is proper and commensurate with the danger is the supposed conduct under the circumstances of a reasonable and prudent man.

Ibid.

■ In the present case there is not an iota of evidence that anyone on the scene thought *at the time* that there was any danger in the manner in which Captain Doody was handling the torpedo. Lindahl, resting under the whaleback 15 to 20 feet away, heard "torpedo" and looked up. He did not come out; instead, he watched a while and then turned away and started to go back to sleep. French

---

Depth charges, identified by absence of any exterior mechanism, should be brought aboard and the same procedure followed.

Floating objects believed to be mines should not be touched. Accurate position should be reported immediately to the nearest naval or Coast Guard activity.

9. For obvious reasons, the personal representative of Captain Doody's estate, who is one of the claimants in this proceeding, does not join in this argument.

also lay under the whaleback "just watching" for 8 to 15 minutes, although he knew that a torpedo had been caught. Obviously, neither Lindahl nor French were alarmed. Martin slept through the whole thing. The mate, Leavitt, who was in the pilot house with Captain Doody, was also plainly not alarmed. So far as appears, he made no suggestion that any other procedure be adopted, nor did he suggest that Captain Doody seek help or advice by radio telephone. Captain Perry and Captain Maillet, both of whom testified as expert witnesses for claimants, were fishing with their own vessels close by the SNOOPY at the time. Captain Doody discussed the situation by radio telephone with Captain Perry, and Captain Maillet overhead the conversation. Despite Captain Perry's testimony at the trial that he would have immediately cut the drag loose, neither he nor Captain Maillet made any such suggestion to Captain Doody at the time.

The quality of Captain Doody's decision to bring the torpedo aboard must be judged in light of the fact that, as Captain Perry testified, it takes time to cut a drag free and "you have to be careful when you do * * *. It will go down with an awful thud." Although there is no evidence that Captain Doody was aware of the procedures for the disposition of explosive objects recommended by the Coast Guard in the Atlantic Notice to Mariners,[10] it is also significant that this Government publication cautioned against attempting to jettison such objects because of the danger of detonation, and recommended that they be brought aboard and carefully secured, the procedure which Captain Doody was attempting to follow.

■ There is no suggestion here that Captain Doody was not a competent captain, and as the Supreme Court said long ago in The Oregon, 158 U.S. 186, 204, 15 S.Ct. 804, 39 L.Ed. 943 (1895), "the judgment of a competent sailor *in extremis* cannot be impugned." See Restatement (Second), Torts §§ 296, 470

(1965). His conduct should not be judged in the "piercing searchlight of hindsight." China Union Lines, Ltd. v. A. O. Andersen & Co., 364 F.2d 769, 779 (5th Cir. 1966), cert. denied, 386 U.S. 933, 87 S.Ct. 1301, 18 L.Ed.2d 353 (1967); Mamiye Bros. v. Barber S.S. Lines, Inc., 360 F.2d 774, 780 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 60, 17 L.Ed.2d 70 (1966). In a case such as this, the words of the court in The Mary T. Tracy, 298 F. 528, 530 (S.D. N.Y.1920) are pertinent:

> It was argued that the captain should have done one of several things other than to go ahead with all the power at his command. I think he decided on the best plan, but, whether he did or not, his decision was the result of a fair exercise of judgment under very difficult circumstances. The contrary view as testified by Capt. Nott called as an expert is but the old story of being able to tell, after the event, what should have been done, where the critics were not there, and were not confronted with the problem nor the emergency. There is always a Capt. Nott. Sometimes he sits by a cozy fireside, and sometimes he testifies in a courtroom. He recites how it could have been better managed, but, if the responsibility had been his, he would have been worried sick, and probably would not have done half as well.

Under all the circumstances, the Court is persuaded that Captain Doody's actions were those of a reasonably prudent fishing vessel captain.

■ On the entire record, the Court holds that petitioner was in no way liable for the sinking of the SNOOPY and is accordingly entitled to a decree of exoneration. Judgment will be entered exonerating petitioner from any liability to the claimants for the deaths and personal injuries resulting from the explosion and sinking of its vessel.

It is so ordered.

---

10. See n. 8, supra.